**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DONALD R. PEVIA,                    *

Plaintiff                                        *

v                                                    *          Civil Action No. ELH-13-2912

BOBBY P. SHEARIN, et al.          *

Defendants                                   *
                                                     *
                                            * * *

**MEMORANDUM**

Plaintiff Donald R. Pevia, a self-represented inmate incarcerated at North Branch Correctional Institution ("NBCI"), asserts that he was subjected to excessive force and physical abuse by correctional officers and others, in violation of his rights under the Eighth Amendment. He has sued defendants Michael Stouffer, Commissioner; Bobby P. Shearin, Warden; Lt. Paul Pennington; CO II Benjamin Friend; CO II Justin Yutzy; CO Soltas; and CO Dorcon,[1] seeking redress under 42 U.S.C. § 1983. ECF 1. Defendants have moved for dismissal or summary judgment (the "Motion"). ECF 14. The Motion is supported by a Memorandum (ECF 14-1) as well as many exhibits. Plaintiff opposes the motion, having filed his own motion for summary judgment, ECF 18, with exhibits.[2]

No hearing is necessary to resolve defendant's Motion or plaintiff's summary judgment motion. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, defendants' Motion, construed as a motion for summary judgment, shall be DENIED, in part and GRANTED in part. Plaintiff's motion shall be DENIED.

---

[1] The Clerk shall correct the spelling of defendants' names. I note that Shearin is no longer the Warden at NBCI.

[2] The exhibits have not been filed through the electronic case management system.

**Factual Summary**

The parties agree that on April 16, 2012, Pevia was handcuffed and secured in an "education booth."  ECF 1; ECF 14-2, Ex. 1 at 3.  Plaintiff describes the booth as being like a telephone booth made of bars.  ECF 1 at 4.

According to Pevia, Officer Pennington approached Pevia and began beating him and screaming at him.  ECF 1 at 4.  Pevia banged on the desk with his cuffs and demanded that the officers "leave him alone."  ECF 1 at 4-5.  Plaintiff claims that, "without hesitation or warning," Pennington sprayed Pevia's face with mace.  *Id*.  Pevia maintains that he tried to avoid having the mace hit him in the face but Pennington continued his assault, circling the booth, chasing plaintiff, and repeatedly spraying Pevia.  *Id*.  Pevia states that when he heard the spray stop he lifted his face and "Pennington was standing and patiently waiting for plaintiff to remove his head to continue the assault.  Paul Pennington was standing in a shooters position with the can of mace positioned as an [sic] gun."  *Id*. at 5.  Pevia states that the use of mace did not stop until another officer, CO II Gomer, grabbed Pennington by the arm and told Pennington "'Thats [sic] enough….'"  *Id*.

Pevia claims that the correctional officers left to escape "the toxic fumes of the pepper spray."  *Id*. at 5.  Yet, plaintiff was left locked in the room while still handcuffed.  Then, the correctional officers returned wearing gas masks.  *Id*.  Pevia asserts that the officers forcibly cuffed him behind his back, in violation of medical orders, causing him severe shoulder pain.[3]  In particular,  Pevia states that defendants Friend and Yutzy refused to comply with plaintiff's order

---

[3] Plaintiff claimed he needed to be front-cuffed due to a medical condition with his shoulder.  I addressed that issue in a separate case, in *Pevia v. Stouffer, et al.*, Civil No. ELH-13-2905.

for front cuffing and, after handcuffing plaintiff behind his back, twisted and stretched his arms upward, causing him severe shoulder pain.

According to plaintiff, CO Soltas did not want to provide medical treatment to plaintiff, stating, "'let'em suffer.'"  *Id.* at 5.  CO Friend and CO Yutzy took plaintiff to the medical department but, upon entering, they "rammed" plaintiff's head into a medical bench.  *Id.* at 6. Plaintiff alleges that the officers covered up a window to block visibility, and then CO Soltas punched Pevia in the face and ribs multiple times.  *Id.*  In addition, plaintiff alleges that the officers threatened him with more abuse if he complained about his injuries.  *Id.*  He also states that he was told that, as "a white guy," he needed to stick with custody staff.  *Id.* at 6.

Plaintiff was allowed to shower to wash off the pepper spray.  Thereafter, he was approached by an unknown officer who told him he was to sign off on the events and report that "no illegal activities occurred…."  *Id.*  Pevia was threatened with more abuse if he refused to sign.  *Id.* at 7.

Thereafter, two staff members asked Pevia whether the officers had acted appropriately. Because he was scared, plaintiff told them "'everything was fine.'"  *Id.* at 7.  Plaintiff was returned to his cell.  *Id.*  Plaintiff alleges that on April 18, 2012, Soltas came to his cell and called him a snitch for filing a complaint against the defendants for excessive force and physical abuse. *Id.* at 7.  He also threatened him if he did not "'drop this issue'…."  *Id.* at 8.

Defendants assert that the incident originated from cell searches on the B-Wing of Housing Unit #1.  ECF 14-2, Exh. 1 (Declaration of John White, NBCI Correctional Case Management Specialist I) at 2.  Defendants maintain that became agitated and spit in the face of CO II Joshua Kennell.  ECF 14-2 at 2-8.  They have submitted the use of force reports generated as a result of the altercation with Pevia.  ECF 14-2, Ex. 1.

According to the Use of Force Report from CO II Donald Drybola, plaintiff started getting agitated and became uncooperative.  CO II Brandon Caple and Drybola removed plaintiff from the area and secured him in the Housing Unit #1 B-Wing Education Booth.  *Id*. at 3.

Defendant Pennington reported that Sergeant Brian Marsh advised him that plaintiff assaulted CO II Kennell by spitting in his face.  *Id*. at 6; *see also* ECF 14-3, Exh. 2 (Letter of Mark J. Carter, Director Internal Investigation Unit, dated April 22, 2014).   Pennington responded to Housing Unit #1 B-Wing, and was advised by CO II Kennell that plaintiff had spit in his face.

In his report, Pennington stated that he spoke with Pevia after he was told that Pevia spat on Kennell.  Pevia was agitated and screaming.  Although Pennington ordered Pevia to calm down, Pevia screamed and threatened him.  *Id*. at 6.  Pennington started to leave the area when Pevia began banging his cuffs on the desk in the educational booth and became more agitated and disruptive.  *Id*.  Pennington directed Pevia to calm down and again began to leave the area when he heard what he believed was Pevia preparing to spit on him. Pennington then turned and sprayed Pevia with pepper spray.  *Id*. at 7.  Pennington indicated that the first burst of spray hit Pevia in the left shoulder, back, and head.  *Id*.  Pevia continued to move around the booth as Pennington continued to give orders for Pevia to stop and attempted to gain control. *Id*.

After the use of the pepper spray, Pevia remained in the education both for several minutes while the officers left the area.  ECF 1 at 5; ECF 14-2, Ex. 1 at 6.  Officers returned with gas masks, re-cuffed Pevia from the front to the back, and escorted him to the medical department.  A medical report is at ECF 14-2 at 14.  Post-incident photographs of plaintiff appear at ECF 14-2 at 15-18.

Defendants indicate that Pevia was interviewed by Detective Sage, and admitted that he had lost control of his emotions on the date of the incident. ECF 14-2 at 13. Pevia advised Sage that he had apologized to staff and reported to Sage that staff acted professionally. ECF 14-2 at 13.

Plaintiff filed an administrative remedy request ("ARP"), NBCI-115-12, on April 24, 2012, which was dismissed for procedural reasons. Defendants note that Pevia did not file an appeal to the Commissioner or a grievance with the Inmate Grievance Office ("IGO"). ECF 14-1 at 5.

### Standard of Review

Plaintiff has moved for summary judgment. ECF 18. Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 14. A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that

conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[4]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons,

---

[4] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). And, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more

discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Here, both sides have attached exhibits in support of their respected motions.  I may consider the exhibits submitted by defendants by construing their motion, like plaintiff's, under the standards applicable to summary judgment.  If a court evaluates the motion as one filed only under Rule 12(b)(6), a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ."  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d at 450.

Summary Judgment is governed by Fed. R. Civ. P. 56(a).  It provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id*. at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or

assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The moving party bears the burden of showing that there is no genuine issue as to any material fact. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In *Anderson,* 477 U.S. at 249, the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

Moreover, the district court may not make credibility determinations on summary judgment. *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d 639 at 644-45. Indeed, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the

factfinder to resolve factual disputes, including matters of witness credibility.  *See*, *e.g.*, *Boone v. Stallings*, 583 F. App'x. 174 (4th Cir. 2014) (*per curiam*).

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation*, 477 U.S. at 323–24).  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Anderson,* 477 U.S. at 248.  On the other hand, a court should award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## Discussion

### A. Supervisory Liability

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Pevia alleges no facts regarding the actions of Commissioner Stouffer or Warden Shearin, or failures to act, in regard to the events of April 16, 2012.   Absent personal involvement by these defendants, there is no basis to support a § 1983 claim against Stouffer and Shearin.  Because Pevia has not pointed to any action or inaction on the part of these defendants that resulted in a constitutional injury, his claims against Stouffer and Shearin shall be dismissed.

Defendants also maintain that Dorcon was not involved in the events complained of, as his name does not appear on any of the incident reports generated as a result of the use of pepper spray.   However, Pevia alleges Dorcon failed to intervene when staff assaulted him in the medical unit and stated that "white people [needed to] stick[] together."  ECF 18 at 5.

**B.    Failure to Exhaust Administrative Remedies**

The court must next examine defendants' assertion that Pevia's claims should be dismissed due to Pevia's failure to exhaust available administrative remedies.  The Prisoner Litigation Reform Act provides, in pertinent part, 42 U.S.C. §1997e:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an administrative remedy procedure available to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction ["DOC"]." Md. Code (2008 Repl. Vol., 2011 Supp.), § 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq.* Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." Code of Maryland Regulations ("COMAR") 12.07.01.01B(8).[5]

---

[5] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only

In the Maryland correctional system, if the particular institution in which an inmate is incarcerated provides an administrative remedy procedure, the inmate must complete the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D. Filing a request for administrative remedy with the Warden of the Maryland prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Inmate Grievance Office. *See* COMAR 12.07.01.03; 12.07.01.05.B; *see also* C.S. § 10-206.

Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1). The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted

---

to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. §
10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S.
§ 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a
final agency determination. However, a decision concluding that the inmate's complaint is
wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must
make a final agency determination within fifteen days after receipt of the proposed decision of
the administrative law judge. *See* C.S. § 10-209(b)-(c).

In either event, the final agency determination is subject to judicial review in Maryland
state court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. But, an
inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative
exhaustion requirement. *See*, *e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A]
prisoner who uses all administrative options that the state offers need not also pursue judicial
review in state court."), *cert. denied*, 537 U.S. 949 (2002).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative
grievances until they receive a final denial of the claims, appealing through all available stages in
the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003), *aff'd,* 98
Fed. App'x. 253 (4th Cir. 2004); *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md.
1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not
appeal his administrative claim through all four stages of the BOP's grievance process); *see also*
*Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to
exhaust where he "never sought intermediate or full administrative review after prison authority
denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner
must appeal administrative rulings "to the highest possible administrative level"); *Pozo v.*

14

*McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Administrative remedies must, however, be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008):

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

As indicated, administrative remedies were available to plaintiff.  Therefore, as a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions.  *See Porter v. Nussle*, *supra,* 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).  If defendants show that a claim is subject to the ARP process but has not been exhausted, the court may not consider the merits of the claim.  *See Jones v. Bock*, 549 U.S. at 220; *see also Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Here, Pevia indicates he filed an ARP, but it was dismissed on procedural grounds.  Defendants complaint because Pevia did not appeal.

Pevia offers that he was advised that the matter had been referred to the Internal Investigation Unit ("IIU").   ECF 18-1 at 6.   He also states that he filed an appeal to the Commissioner, which was dismissed.   Thereafter, he filed a claim to the IGO, which was also dismissed.   *Id.*

Pevia has provided a copy of the complaint he filed with the IGO, which is date stamped as received by the IGO on June 8, 2012.   ECF 18-2 (attachments).   He also provided copies of his ARP, which was dismissed due to the IIU being notified of his complaint.   *Id.*   He was specifically advised that because the IIU was notified of the allegations, "No further action will be taken through the ARP process."   *Id.*   It is clear that Pevia exhausted the remedies that were "available" to him.   As such, Pevia's complaint is not subject to dismissal for failure to exhaust administrative remedies.

**C.    Excessive force**

To proceed under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law.   *Baker v. McCollan*, 443 U.S. 137, 140 (1979).   To state a claim under § 1983, a plaintiff must: 1) "allege the violation of a right secured by the Constitution and laws of the United States"; and 2) "show that the alleged deprivation was committed by a person acting under color of state law."   *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 112 (2011).

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment.   *See Whitley v. Albers*, 475 U.S. 312, 391-21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7-9 (1992).   The use of force by a prison officer

violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'" *Wilkins*, 559 U.S. at 38 (citation omitted).

The Eighth Amendment inquiry is focused on whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. This court must consider multiple factors, such as the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U. S. at 321.

The Supreme Court has made clear that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment. *Wilkins*, 559 U.S. at 37 (citations omitted). Conversely, the absence of "significant" injury is not dispositive of a claim of excessive force. *Id.* at 36-37. Moreover, if force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] had the good fortune to escape without serious injury." *Id*. at 37. Put another way, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment. *Id.* at 38-40. But, the extent of an inmate's injury is one factor indicative of whether the force used was necessary in a particular situation.

In regard to the use of pepper spray by prison officers, "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763

(4th Cir. 1996)) (emphasis omitted).  However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment.  *Williams*, 77 F.3d at 763.

There are three general areas in which courts have held that use of pepper spray or other chemical agents may constitute excessive force in violation of the Eighth Amendment.  First, an Eighth Amendment violation has been found when an officer used far more than a reasonable quantity of a chemical agent.  *See, e.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and another officer joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Second, Eighth Amendment violations have been found when a chemical agent was used without a prior verbal command, or after a prisoner had been subdued or had become compliant with an officer's instructions.  *See Tedder v. Johnson*, 527 F. App'x 269 (4th Cir. 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d. 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray as a first resort without prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence that inmate "did not intentionally disobey [officer], use profanity or abusive language, or threaten any correctional officer, and . . . was [pepper] sprayed without warning").

Courts have also concluded that the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention. *See, e.g.*, *Walker v. Bowersox*, 526 F.3d. 1186, 1189 (8th Cir. 2008) (finding Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); *Norton v. City of Marietta*, 432 F.3d 1145, 1153-54 (10th Cir. 2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if "'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The Fourth Circuit's 2008 decision in *Iko v. Shreve*, *supra*, 535 F.3d 225, involving use of pepper spray in extracting an inmate from his cell, illustrates each of the three categories. There, the Court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'" *Id.* at 239.   Nevertheless, the *Iko* Court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," *id.* at 239-40; the inmate was "docile and passive throughout the cell extraction," *id.* at 239; the officer's "final burst of pepper spray was deployed *after* [the inmate] had lain down on the floor of his cell," *id.* at 240 (emphasis in original); and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never

changed [the inmate's] clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure." *Id.*

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D.W. Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown). Use of chemical agents is reasonable when a prisoner attempts to escape or evade an officer's control. *See Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). Finally, use may be also reasonable when an officer is attempting to maintain order and discipline in the institution. *Santiago v. Walls*, 599 F.3d. 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d. 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

It is unclear from the materials submitted to the court what threat Pevia reasonably presented to Pennington, secured as he was in handcuffs and in some type of booth. Defendants have failed to address Pevia's claim that the amount of pepper sprayed deployed on him was excessive relative to the threat he presented by his obnoxious behavior. Further, defendants have entirely failed to address Pevia's claim that, after the pepper spray incident, he was improperly handcuffed from behind and his hands were intentionally yanked upward to cause him harm. Nor have defendants addressed Pevia's claim that he was spontaneously assaulted by defendants within the medical unit.

Defendants also do not address plaintiff's claim that he was threatened with future harm if he complained of the assault. Pevia has provided affidavits from other inmates attesting that they heard Soltas threaten plaintiff due to Pevia having filed an ARP regarding the incident. ECF 18, Attachments.

Defendants offer only the use of force reports prepared in response to the pepper spray incident, none of which are prepared under the penalties of perjury. The court has not been provided with affidavits from any of the named defendants concerning the matters alleged by Pevia. Nor has the court been provided with any video evidence or medical documentation from the days following the incident, which may shed light on Pevia's claim that he was assaulted without provocation within the medical unit. Further, Pevia's allegations against Dorcon are not addressed at all.

In cases where, as here, defendants offer little to no justification for the alleged application of force (the use of pepper spray on an inmate handcuffed and held within a secure booth) or deny there was an application of force (as to the cuffing allegation and spontaneous assault in the medical unit), there exists a genuine dispute of material fact regarding whether the force was applied maliciously, precluding summary judgment. The issue requires determinations not presently appropriate for resolution on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The determination of whether defendants are entitled to qualified immunity is more appropriately addressed after the facts of the case have been developed and a determination has been made as to whether Pevia has suffered a violation of his constitutional rights. Accordingly, dismissal of Pevia's complaint based on qualified immunity is not proper at this time.

In light of the foregoing, Pevia's complaint against Shearin and Stouffer shall be dismissed.   The pending dispositive motions shall be denied in all other respects, without prejudice to the right to refile them at a later date.

A separate Order follows, which includes a schedule that shall govern in this case.


<u>February 10, 2015</u>                      _____/s/_____
Date                                          Ellen Lipton Hollander
                                              United States District Judge